**Terry MORRONE, Plaintiff,**

v.

**CSC HOLDINGS CORPORATION, Town of Huntington, and the Public Service Commission of the State of New York, Defendants.**

**No. 05–CV–898 ADS ARL.**

United States District Court,
E.D. New York.

April 4, 2005.

Terry Morrone, Greenlawn, NY, Pro se Plaintiff.

Rivkin Radler LLP by William M. Savino, Esq., Stephen J. Smirti, Jr., Esq., Jason Brian Gurdus, Esq., Of Counsel, Uniondale, NY, Co-counsel for the Defendant CSC Holdings Corp.

Thelma N. Neira, Esq., Huntington, NY, for the Town of Huntington.

Jonathan D. Feinberg, Esq., Albany, NY, for the NYS Dept. of Public Service.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Presently before the court is a request for a preliminary injunction. Terry Morrone (the "Plaintiff") commenced this action by filing a complaint and an order to show cause seeking a temporary restraining order, preliminary injunction, and an order enjoining the defendant Cablevision Systems Corporation (the "Defendant" or "Cablevision") from administering a new system to allocate channel time for public access television. The Plaintiff claims that Cablevision's proposed action violates the Cable Communications Policy Act ("Cable Act"), 47 U.S.C. § 521–73, and state laws and regulations relating to cable television, see N.Y. Pub. Serv. Law, Art. 11 and N.Y. Comp.Codes R. & Regs. tit 9 § 595.4. For the reasons set forth below, the Plaintiff's application for a preliminary injunction is denied.

## BACKGROUND

The factual background of this case is clear, uncomplicated, and for the most part, undisputed. The Plaintiff is an amateur producer of a public access television program known as "Alternate Voices," which discusses controversial social and political issues. In the past, Cablevision allocated specific program time slots on public access channels on an in-person "first come, first serve, non-discriminatory basis." This was accomplished by Cablevision informing the public in writing, on their website, and on the public access channel, as well as verbally, of the date and time that a time-slot application could be made. Time-slots consist of either a half-hour or full hour segment, to be aired weekly. Applicants would apply for their preferred time-slots in person by lining up in person at Cablevision's office. One-by-one Cablevision would fill the time slots on the channel on a first come, first serve basis done immediately while the applicant waited. This process was repeated twice a year.

As alleged in the complaint, retaining the same time slot each week is the main way in which a producer builds an audience or following because cable subscribers do not receive a printed schedule of the public access shows. Once the show is moved to another time slot it is very difficult for the viewer to find it again. As a result, public access producers who desire to keep their time slot have chosen to arrive the night before the day Cablevision designates for the receipt of applications in hopes of increasing their chance of renewing their existing time slot. When Cablevision would open for business in the morning, amateur producers would often be lined up waiting so that they could obtain the time that they previously had.

This year, Cablevision instituted a new process whereby the public must apply for time-slots by mail and all applications that are mailed on a particular date are then placed in random order by a computer program. This process has been labeled by both parties at times as a computer "Lottery" system. The Plaintiff claims that this system does not meet the "first-come, first-serve, non-discriminatory" requirement of the Cable Act.

## DISCUSSION

### I. Preliminary Injunction Standard

■ To obtain a preliminary injunction, a plaintiff must show: (1) irreparable harm; and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in the plaintiff's favor. *See International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 70 (2d Cir.1996); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). The Court will now discuss the merits of the Plaintiff's claim.

### II. The Cable Act

■ Cable television operators, such as the defendant Cablevision, are regulated by the Cable Act, *see* 47 U.S.C. § 521–73, and state laws and regulations. *See* N.Y. Pub. Serv. Law, Art. 11; N.Y. Comp. Codes R. & Regs. tit 9 § 595. To the extent that the state and federal statutes differ, the federal statutes control. *See Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698–700, 104 S.Ct. 2694, 2699–701, 81 L.Ed.2d 580 (1984); *Cable Television Ass'n of New York, Inc. v. Finneran*, 954 F.2d 91, 97–98 (2d Cir.1992).

Pursuant to the Cable Act, any "governmental entity empowered by Federal, State, or local law to grant a franchise," 47 U.S.C. § 522(10), may provide a cable operator with the authorization to construct or operate a cable system, *see* 47 U.S.C. § 522(9) (defining franchise). Cable operators must comply with the terms of the resultant franchise agreement in addition to following federal and state law.

The Cable Act permits franchising authorities, typically a local government or municipality, to require cable operators to provide public, educational, and governmental ("PEG") channel capacity on their systems. *See* 47 U.S.C. §§ 531(a); *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 734, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (noting that local governments require cable system operators to set aside channels for PEG use in exchange for "permission to install cables under city streets and to use public rights-of-way"). The Cable Act also allows franchising authorities to require cable operators to establish rules and procedures for the use of the channel capacity designated for PEG programming. *See* 47 U.S.C. § 531(b). However, the Cable Act prohibits cable operators from exercising "any editorial control over any public, educational or governmental use of channel capacity provided pursuant to this section, except a cable operator may refuse to transmit any public access program or portion of a public access program which contains obscenity, indecency, or nudity." 42 U.S.C. § 531(e).

The New York State Public Service Commission ("NYSPSC") is responsible for regulating the cable television industry in New York state. *See* N.Y. Pub. Serv. Law §§ 211, 215. The NYSPSC promulgates minimum standards that are incorporated by law into every franchise agreement. *See* N.Y. Pub. Serv. Law § 215(b); *Goldberg v. Cablevision Systems Corp.*, 261 F.3d 318, 320 (2d Cir.2001). Those standards include "provisions regarding access to, and facilities to make use of, channels for ... public service programs." N.Y. Pub. Serv. L. § 215(2)(b); *Goldberg*, 261 F.3d at 320.

State regulations provide that New York cable operators with a capacity of 21 or more channels must designate at least one full-time channel for public access and at least one full-time channel for educational and governmental use. *See* N.Y.Code R. & Regs. tit. 9 § 595.4(b)(1). The regulations define "public access channel" as a "channel designated for noncommercial

use by the public on a first-come, first-served, nondiscriminatory basis." *Id.* § 595.4(a)(1). Similar to federal law, the state regulations prohibit franchisees and municipalities from exercising "any editorial control over any public, educational or governmental use of channel capacity designated for PEG purposes." N.Y. Comp. Codes R. & Regs. tit. 9 § 595.4(c)(8), (9). In addition, § 229(3) of the Public Service Law prohibits cable operators from barring or limiting "any program or class or type of program presented over a ... channel made available for public access." N.Y. Pub. Serv. Law § 229(3).

Section 531(e) of the Cable Act states:

Subject to section 624(d) [47 USCS § 544(d)], a cable operator shall not exercise any editorial control over any public, educational, or governmental use of channel capacity provided pursuant to this section, except a cable operator may refuse to transmit any public access program or portion of a public access program which contains obscenity, indecency, or nudity.

47 U.S.C. § 531(e).

The express purpose of this section is to "assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public." 47 U.S.C. § 521(4). In passing this legislation, Congress intended the absence of editorial control to further the goal of public access channels, which is to "provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the marketplace of ideas." H.R.Rep. No. 98–934, at 30 (1984), *reprinted in* 1984 U.S.C.C.A.N. at 4667.

The Second Circuit has held that an implied private cause of action exists under § 531(e) for improperly exercising editorial control. *McClellan v. Cablevision of Connecticut,* 149 F.3d 161 (2d Cir.1998). A cable corporation that provides channels for public access is prohibited from exercising any editorial control, except with regard to obscenity. *See Glendora v. Cablevision Systems Corp.,* 45 F.3d 36, 38 (2d Cir.1995). The Second Circuit has interpreted the prohibition against editorial control set forth in § 531(e) to mean that cable operators are precluded "from attempting to determine the content of programming that is within the PEG categories." *Time Warner Cable v. Bloomberg, L.P.,* 118 F.3d 917, 928 (2d Cir.1997).

However, whether an implied right of action still exists under this statute is questionable. Subsequent to the cases that held that a private right of action does exist under § 531(e), the Supreme Court has retreated from its position of implying a cause of action where Congress has not expressly provided for one. *See Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Several courts have recently concluded that this pronouncement abrogates any private right of action under § 531(e). *See Leach v. Mediacom,* 240 F.Supp.2d 994, 996 (D.Iowa 2003), *aff'd, Leach v. Mediacom,* 373 F.3d 895, 896 (8th Cir.2004); *Egli v. Comcast of Pa., LLC,* 2004 WL 2166301, 2004 U.S. Dist. LEXIS 19740 (E.D.Pa. 2004).

■ In this case, it is unnecessary for the Court to determine whether a private right of action exists at this time. Here, no credible evidence has been presented to show that the new system is discriminatory in any manner. Insofar as the new system is non-discriminatory, there is little likelihood of the Plaintiffs succeeding. The Cable Act prohibits cable operators from exercising editorial based decisions. The changes that Cablevision wishes to implement appear to be neutral with regard to content. Regulations that are con-

tent neutral are not prohibited under § 531(e).

In fact, Cablevision's new system appears to be much fairer by permitting access to producers who cannot stand in line overnight waiting for a time-slot. For example, sick and disabled persons were at a disadvantage under the former system. Under the new system, a greater number of persons have access to public television time-slots, instead of allowing only those persons who can wait overnight in a line outside of Cablevision's office. In addition, the Court finds that the new system furthers the intent of the Cable Act by "provid[ing] the widest possible diversity of information sources and services to the public." 47 U.S.C. § 521(4).

■ Also, the parties have informed the Court that the NYSPSC has instituted an administrative proceeding to determine whether the new system complies with its regulations requiring public access channels be given out "on a first-come, first-served, nondiscriminatory basis." N.Y.Code Rules & Regs., tit. 9, § 595.4(c)(4). This proceeding was prompted by petitions from Annie McKenna Faraldo, one of the Plaintiff's supporters who appeared at the order to show cause hearing. The NYSPSC has administrative jurisdiction over this matter. *See* N.Y. Pub. Serv. Law § 211. The Supreme Court has enunciated a principle known as the "Burford abstention." This doctrine instructs:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal re-

view of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (citations and quotations omitted); *see also, Tribune Co. v. Abiola*, 66 F.3d 12 (2d Cir.1995).

Here, all of the factors are present to apply the Burford Abstention doctrine. The Plaintiff seeks only equitable relief. The NYSPSC has instituted timely proceedings to determine whether Cablevision is in compliance with the regulations, and the state has an interest in having a coherent policy in this area. Without a coherent policy, different cable providers in different locations may receive unequal treatment under the applicable regulations. There is also an appeal process from the decision that the NYSPSC will render under New York law known as an Article 78 proceeding. As such, it appears that it is proper for this Court to abstain from a decision in this case at this time.

■ To clarify what was pronounced at the Court's oral rendering of its decision in this matter, a discussion regarding the Burford abstention doctrine is necessary. The Burford abstention doctrine is applied in order to avoid needless conflict with administration by a state of its own affairs. *See Weiser v. Koch*, 632 F.Supp. 1369, 1384 (S.D.N.Y.1986). Under the doctrine, a federal court has the power to refrain from hearing a case that it could readily handle where it is duplicative of a pending state proceeding. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). "[I]t has long been established that a federal court has the authority to decline to exercise its jurisdiction when it 'is asked to employ its historic powers as a

court of equity...'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 717, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). However, the Second Circuit has cautioned that abstention is the exception and should only be applied in very limited circumstances. *See Hachamovitch v. DeBuono*, 159 F.3d 687, 697 (2d Cir.1998); *United Fence & Guard Rail Corp. v. Cuomo*, 878 F.2d 588, 593 (2d Cir.1989).

A court has three options when it decides to refrain from the action under the Burford abstention doctrine. The court may dismiss the action, remand the action to state court if it was commenced there, or stay the action. *See id.* at 721, 116 S.Ct. 1712, 135 L.Ed.2d 1. The Supreme Court has held that "an order merely staying the action 'does not constitute abnegation of judicial duty. On the contrary, it is a wise and productive discharge of it. There is only postponement of decision for its best fruition.'" *Id.* (quoting *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 29, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959)).

■ In this case the Court finds that the appropriate course of action is to stay this case during the pendency of the state proceeding. Waiting until the NYSPSC determines whether the new system complies with state regulations conserves judicial resources and avoids duplication or inconsistent findings. The NYSPSC is not only better situated in interpreting its own regulations, but also has an interest in applying a consistent and coherent policy in this area. Inconsistent application of the cable regulations may lead to problems in other locations that are not serviced by Cablevision.

This Court will retain jurisdiction "in order to insure a just disposition of this litigation should anything prevent a prompt state court determination." *Kaiser Steel Corp. v. W.S. Ranch Co.*, 391 U.S.

593, 594, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968). At the conclusion of the state court proceedings, if necessary, this Court will vacate the stay to adjudicate any federal claims that could not be litigated and are not "inextricably intertwined" with any issue decided in the state court proceeding. *See, e.g., Hachamovitch*, 159 F.3d at 694–95 (explaining the limits of federal court jurisdiction under the Rooker–Feldman doctrine). If the state court prejudices a federal right of the parties, this can be redressed by review of the state decision in the United States Supreme Court. *See* 17A Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4245 (2d ed. 1988 & Supp.2005).

■ As for the Plaintiff's section 1983 claim, it is clear that Cablevision is not a state actor, nor does the Plaintiff allege that the Defendant is a state actor or is acting under color of state law. Also, the courts have routinely held that public access channels are not First Amendment "public forums" for the purposes of state action. *Glendora v. Hostetter*, 916 F.Supp. 1339, 1341 (S.D.N.Y.1996); *accord Glendora v. Cablevision Systems Corporation*, 893 F.Supp. 264, 269 (S.D.N.Y.1995); *see also Alliance for Community Media v. FCC*, 56 F.3d 105, 120–21 (D.C.Cir.1995). Thus, there is no likelihood of success on any claim under section 1983 against Cablevision.

For the above reasons, the Court finds that the Plaintiff does not have a likelihood of success on the merits or a sufficiently serious questions going to the merits. Moreover, in the Court's view the Plaintiff has failed to show how there is a likelihood of irreparable harm. The Plaintiff claims that the Lottery system will lead to his show being aired less frequently and at different times, or in the worst case, not at all. However, these perceived harms are

not irreparable. These alleged "harms" can only lead to a loss in their viewing audience and to their prestige. The Plaintiff can utilize alternate means to ensure that their audiences are aware of the air times of their shows, such as advertising, publicity, the internet, or other information disseminating mediums. Indeed, at oral argument the Plaintiff alluded to self-help remedies under the new system such as having friends and family apply for specific timeslots for him, thereby increasing his chance of obtaining the most desired time-slot. As such, the Court cannot find any irreparable harm that may occur if the proposed system continues to be implemented.

## CONCLUSION

Having given the parties an opportunity for oral argument, and based on the foregoing it is hereby

**ORDERED**, that the Plaintiffs motion for a preliminary injunction is **DENIED**; and it is further

**ORDERED**, that the action is stayed pending the determination of the NYSPSC; and it is further

**ORDERED**, that the parties are directed to report to the Court within sixty days of the date of this order regarding the progress of the pending action before the New York State Public Service Commission.

**SO ORDERED.**